UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| KATHY DREW KING, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD | \* \* \* \* \* | |
| Petitioner | \* \* | --CV-- |
| v. | \* \* | |
| THERMO FISHER SCIENTIFIC INC. | \* \* | |
| Respondent | \* \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PETITION FOR PRELIMINARY INJUNCTION
UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT**

## TABLE OF AUTHORITIES

### Cases

*Abbey's Transp. Servs., Inc. v. NLRB,*
   837 F.2d 575 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35, 36, 39

*Aguayo v. Tomco Carburetor Co.,*
   853 F.2d 744 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41, 42

*Angle v. Sacks,*
   382 F.2d 655 (10th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41, 42

*Calatrello v. Gen. Die Casters,*
   2011 WL 446685 (N.D. Ohio 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

*Concrete Form Walls, Inc.,*
   346 NLRB 831 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

*Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, I.L.G.W.U.),*
   494 F.2d 1230 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Dash v. NLRB,*
   793 F.2d 1062 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

*Fernbach v. Sprain Brook Manor Rehab, LLC,*
   2015 WL 1029655 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

*Frankl v. HTH Corp.,*
   650 F.3d 1334 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

*Fuchs v. Jet Spray Corp.,*
   560 F. Supp. 1147 (D. Mass. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*G&T Terminal Packaging Co., Inc.,*
   246 F.3d 103 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 29

*Garcia v. Sacramento Coca-Cola Bottling Co.,*
   733 F.Supp. 2d 1201 (E.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

*Golden State Foods Corp.,*
   340 NLRB 382 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 33

*Hampton Inn NY—JFK Airport,*
   348 NLRB 16 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Hoffman v. Inn Credible Caterers, Ltd.,*
   247 F.3d 360 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 20, 38

*Kaynard v. Mego Corp.,*
   633 F.2d 1026 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 20, 38

*Kaynard v. Palby Lingerie, Inc.,*
   625 F.2d 1047 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*Kobell v. Suburban Lines, Inc.,*
   731 F.2d 1076 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

*Kreisberg v. HealthBridge Management, LLC,*
   732 F.3d 131 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 38

*Manor Care of Easton, Pa,*
   356 NLRB 202 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 23

*Mattina v. Kingsbridge Heights Rehabilitation and Care Center,*
   329 Fed.Appx. 319 (2d. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*McLeod v. Business Machine and Office Appliance Mechanics Conference Board,*
   300 F.2d 237 (2d Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Mercy Hospital Mercy Southwest Hospital,*
   338 NLRB 545 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21, 24

*Morio v. North American Soccer League,*
   632 F.2d 217 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37, 43

*NLRB v. Electro-Voice, Inc.,*
   83 F.3d 1559 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20, 41

*NLRB v. Exchange Parts Co.,*
   375 U.S. 405 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*NLRB v. Future Ambulette, Inc.,*
   903 F.2d 140 (2d Cir. 1990).                                                        .36
*NLRB v. Jamaica Towing, Inc.,*
   632 F.2d 208 (2d Cir. 1980).                                                        .39
*NLRB v. Matros Automated Electrical Construction Corp.,*
   366 Fed.Appx. 184 (2d Cir.2010).                                                    .25
*NLRB v. Ona Corp.,*
   605 F. Supp. 874 (N.D. Ala. 1985).                                                  .42
*NLRB v. Sprain Brook Manor Nursing Home, LLC,*
   630 Fed. Appx. 69 (2d Cir. 2015).                                                   .7
*NLRB v. Transportation Mgmt Corp.,*
   462 U.S. 393 (1983).                                                                .25
*Norelli v. HTH Corp.,*
   699 F.Supp. 2d 1176 (D.Haw. 2010).                                                  .42
*Overstreet v. One Call Locators Ltd.,*
   46 F.Supp. 3d 918 (D. Ariz. 2014).                                                  .42
*Paulsen v. Remington Lodging & Hospitality, LLC,*
   773 F.3d 462 (2d Cir. 2014).                                                        .19, 38
*Pye v. Excel Case Ready,*
   238 F.3d 69 (1st Cir. 2001)                                                         .39, 40, 41, 42
*Real Foods Co.,*
   350 NLRB 309(2007).                                                                 .25, 34
*Rubin v. Vista del Sol Health Services, Inc.,*
   2015 WL 306292 (C.D. Cal. 2015).                                                    .42
*Schaub v. West Michigan Plumbing and Heating,*
   250 F.3d 962 (6th Cir. 2001).                                                       .40
*Seeler v. The Trading Port, Inc.,*
   517 F.2d 33 (2d Cir. 1975).                                                         .19, 20, 37, 38
*Sharp v. Webco Industries, Inc.,*
   225 F.3d 1130 (10th Cir. 2000).                                                     .40
*Silverman v. J.R.L. Food Corp. d/b/a Key Food,*
   196 F.3d 334 (2d Cir. 1999).                                                        .19
*Silverman v. Major League Baseball Player Relations Comm., Inc.,*
   67 F.3d 1054 (2d Cir. 1995).                                                        .20
*Silverman v. Major League Baseball Player Relations Comm., Inc.,*
   880 F. Supp. 246 (S.D.N.Y. 1995).                                                   .38
*Silverman v. Whittal & Shon, Inc.,*
   125 LRRM 2150, 1986 WL 15735 (S.D.N.Y. 1986).                                       .41
*St. Margaret Mercy Healthcare Centers,*
   350 NLRB 203 (2007).                                                                .25
*United Nurses Associations of California v. NLRB,*
   871 F.3d 767 (9th Cir. 2017).                                                       .43

## Statutes

29 U.S.C. Sec. 160(j).                                                                 .6, 18
29 U.S.C. § 151                                                                        .38
29 U.S.C. § 157.                                                                       .38
29 U.S.C. § 158(a)(3).                                                                 .24

## Other Authorities

*Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA,*
   96 Harv. L. Rev. 1769 (1983).                                                       .41

## I.     **INTRODUCTION**

This case involves an egregious and unrelenting campaign by Thermo Fisher Scientific Inc., herein called Respondent, to defeat the rights conferred upon its employees by Section 7 of the National Labor Relations Act. Respondent's campaign included the discharge of Herman Isaza, the employee who single-handedly conceived of and launched the union organizing drive, met with employees during lunch breaks for months discussing organizing a union, sent emails to 30 co-workers calling them "wage slaves" under Respondent's pay scale, and set up a pro-organizing website targeted to his co-workers.  Respondent further unlawfully granted first-of-its-kind wage increases tied to employees' mid-year evaluations in an effort to thwart Isaza's organizing campaign. Without an immediate injunction the Employer's illegal effort will succeed.

## II.     **STATEMENT OF THE CASE**

This proceeding is before the Court on a petition filed by the Regional Director of Region 29 of the National Labor Relations Board, herein called the Board, pursuant to Section 10(j) of the National Labor Relations Act, as amended (61 Stat. 149, 73 Stat. 544, 29 U.S.C. Sec. 160(j)), herein called the Act. Section 10(j) of the Act provides that upon issuance of an administrative complaint charging that a person has engaged in or is engaging in an unfair labor practice, the Board may petition the District Court "for appropriate temporary relief or a restraining order." *See* 29 U.S.C. § 160(j) (1998).

Petitioner, Kathy Drew King, Regional Director of Region 29 of the Board, brings this petition against Respondent, for a preliminary injunction pending the final disposition of the matters involved herein pending before the Administrative Law Judge and the Board, based on a Complaint and Notice of Hearing that alleges, *inter alia*, that

1

Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and (3) of the Act.[1]

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer, "by discrimination in regard to hire or tenure of employment or any term or condition of employment[,] to encourage or discourage membership in any labor organization." For instance, as the Second Circuit explained, "an employer violates Section 8(a)(3) by disciplining or discharging an employee for engaging in Section 7 activity [in support of a union]."[2] As another example, an employer violates Section 8(a)(3) by granting a wage increase to employees in order to discourage them from supporting a union. Indeed, as the Supreme Court recognized, "[t]he danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove."[3]

## II.    SUMMARY OF THE DISPUTE

This case presents a hallmark violation of the Act in which an employer nips in the bud a nascent union organizing campaign by committing serious unfair labor practices, including by targeting and terminating the well-known leader of that campaign. This hallmark violation recurs time and time again for good reason. As this case demonstrates, an unlawful nip-in-the-bud termination is perhaps the most effective way for an unscrupulous employer to make it clear to its employees that (despite the Act's

---

[1] Section 8(a)(1) states that it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7 of the Act]." Because Section 8(a)(1)'s prohibition is broader than the more specific prohibition contained in Section 8(a)(3), any violation of latter constitutes a derivative violation of the former.

[2] *NLRB v. Sprain Brook Manor Nursing Home, LLC*, 630 Fed. Appx. 69, 71 (2d Cir. 2015).

[3] *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964).

protections) they may support a union, or they may retain their jobs, but the employer will not permit employees to do both.

The instant case presents an even more coercive anti-union effort than the unlawful playbook described above. While wielding the "stick" of termination is frequently sufficient to warn employees against supporting a union, here, Respondent went a step further by simultaneously offering the "carrot" of wage increases in an effort to buy employees' loyalty. As employee interest in unionization grew based primarily on Respondent's below-market wages, Respondent took action to defeat the organizing campaign by granting unprecedented wage increases during its midyear appraisals. In this unlawful way, Respondent attempted to show its employees that a labor organization is unnecessary because the company will address their grievances, as long as they remain loyal and don't exercise their Section 7 right to organize a union to better their working conditions.

Respondent's carrot-and-stick approach accomplished its unlawful purpose. Employees observed that Respondent terminated the one worker who conceived the idea of forming an independent union, which he branded Printing Pressmen of Clintrak (herein called the Union), within months of beginning the campaign. Meanwhile, the workers who remained saw that Respondent remedied employees' main complaint, low wages. The effect, unsurprisingly, is that out of fear of also being terminated or losing the wage increase that they so badly needed, most of Respondent's employees abandoned the idea of forming the Printing Pressmen of Clintrak and no longer talk about forming a union at all.

## III.   PROCEDURAL HISTORY

On September 15, 2017, Herman Isaza, herein called Isaza, filed an unfair labor practice charge in Case No. 29-CA-206244 and a first amended charge in the same case on October 6, 2017.[4] On December 7, 2017, after investigating the charge, the Regional Director for Region 29 issued a Complaint and Notice of Hearing[5] alleging, *inter alia*, that Respondent engaged in, and is engaging in, unfair labor practices within the meaning of Sections 8(a)(1) and (3) of the Act. A hearing before an Administrative Law Judge is currently scheduled for March 6, 2018.

The Complaint alleges that Respondent took various adverse actions against Isaza in retaliation for his activities in support of the Printing Pressmen of Clintrak, and to discourage employees from engaging in these activities. Those adverse actions include imposing more onerous working conditions on Isaza by increasing his workload, repeatedly disciplining him, issuing him an unfavorable performance appraisal, and ultimately terminating him. The Complaint also alleges that Respondent granted to its employees unprecedented mid-year wage increases to discourage employees from supporting the Union's organizing campaign, and thereby interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act.

## IV.   STATEMENT OF THE FACTS[6]

---

[4] Exhibit A includes the charge and the first amended charge. All Exhibits are attached to the Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act.

[5] Exhibit B

[6] All facts were adduced from sworn affidavits taken from employee witnesses, interviews with employee witnesses who refused to provide an affidavit out of fear of reprisal, interviews with Respondent witnesses (although requested, Respondent refused to allow the Board to take sworn affidavits from its witnesses), Respondent's position statements, and documentary evidence provided by Respondent during the

4

## A.   **THE EMPLOYER AND ISAZA**

Respondent is a worldwide company that offers a wide array of scientific services and products "with revenues of more than $20 billion and approximately 65,000 employees globally."[7] At its Bohemia, New York facility, known as Clintrak Clinical Labeling Services, Respondent produces labels for use in clinical trials for the pharmaceutical and biotechnology industries.

Herman Isaza worked for Respondent at its Bohemia facility from 2014 until his termination on September 14, 2017, most recently as a third-shift Onset Press Operator. Exh. C ¶1. Isaza's duties in this role were to create digital labels using the Onsert Press. *Id.* Before he began an organizing drive to form the Union, Respondent repeatedly rewarded Isaza as an exceptional performer. During his tenure, Isaza was given promotions with accompanying raises three times, elevating him from his position as another employee's assistant to one where he had his own assistant and was entrusted with the responsibility of operating a unique and complex piece of machinery during the overnight shift. *Id.* On one of his early performance appraisals, Respondent glowingly praised Isaza, stating that he, "has continually shown himself to be a team player" and "picked up the requirements of the department quicker than anybody has in the history of the department – excellent work!" Exh. D at 2. As recently as January or February 2017, General Manager Bob Scarth discussed sending Isaza to another one of Respondent's facilities in Basel, Switzerland, under Scarth's personal oversight, as a model employee from whom other employees would learn to operate the Onsert Press. Exh. C ¶15.

---

investigation of Case No. 29-CA-206244.

[7] http://corporate.thermofisher.com/en/about-us.html

**B.      ISAZA SINGLE-HANDEDLY INITIATED A CAMPAIGN TO FORM AN INDEPENDENT UNION AND RESPONDENT IMMEDIATELY MOVED TO NIP IT IN THE BUD BY UNLAWFULLY TARGETING AND ISOLATING ISAZA**

In February 2017, [8] Isaza single-handedly launched an independent union organizing campaign. Exh. C¶6. He met with his co-workers in Respondent's lunchroom during breaks through April, attempting to garner their support for creating an independent labor union to represent employees. *Id.* During that time, he spoke with approximately 20 employees, six or seven of whom said they wanted to join an organizing committee. *Id.* On June 7, Isaza sent an email to approximately 30 of his co-workers attaching a file, named "Wage slaves of Clintrak, unite!," which urged them to organize and criticized Respondent's pay scale. Exh. E. Isaza also published a pro-organizing website targeted to his co-workers. [9]

One day after sending the mass email to his co-workers, on June 8, one of Isaza's co-workers sent Isaza's pro-union email to Isaza's direct supervisor, Rasul, who forwarded it to another manager (Associate Director of Production Logistics Kevin Greenwood) and to Human Resources. Within about one hour of receiving Isaza's email, Respondent immediately triggered a plan to quarantine Isaza's message and isolate Isaza himself to prevent him from spreading the word about the union. Exh. F. Although Respondent may not have ultimately followed through on all of these action items, Greenwood's first instinct was to direct an employee to suspend Isaza's computer account, suspend Isaza's security badge access, "pull back the undelivered messages,"

---

[8] Hereafter, all dates refer to 2017 unless otherwise noted.

[9] https://unionizeclintrak.tumblr.com/

track Isaza's activity, and "blacklist" Isaza's personal email address (i.e. do not allow outbound Thermo Fisher email traffic to go to Isaza's private email address). *Id.*

While it is not clear whether Respondent ultimately executed all of these actions after deciding to target and isolate Isaza, the evidence is clear that Respondent did revoke Isaza's security badge access, causing him to be locked out of the building when he reported for his next shift. Exh. C ¶14. There is no doubt that Respondent very quickly immediately retaliated against Isaza in other ways, as well.

**C.     RESPONDENT IMMEDIATELY AND FORCEFULLY RESPONDED TO THE ORGANIZING CAMPAIGN BY LAUNCHING AN ANTI-UNION CAMPAIGN, THAT INCLUDED UNLAWFULLY GOING AFTER ISAZA BY IMPOSING PRETEXTUAL DISCIPLINE AND GIVING EMPLOYEES UNPRECEDENTED PAY RAISES, BOTH IN AN EFFORT TO DEFEAT THE CAMPAIGN**

Beginning on June 8, Respondent increased Isaza's workload by requiring that he perform more jobs and more time-consuming jobs, all during the same number of hours in his regular shift.[10] Exh. C ¶10. Additional evidence demonstrates that Respondent subsequently began building a paper trail of pretextual performance concerns through pretextual disciplines and a negative performance appraisal to manufacture a case against Isaza as cover to its plan to rid itself of Isaza.

On June 9, just one day after learning that Isaza had initiated the Union campaign, Respondent launched an anti-union campaign. General Manager Scarth joined the daily meeting attended by Isaza's overnight shift and the incoming morning shift, at which he voiced Respondent's opposition to unions. Exh. C ¶15. In addition to Scarth's anti-Union

---

[10] While Isaza's affidavit also addresses an increase in Isaza's workload through a reduction in the formula used to calculate the time estimate for each job, that component of Isaza's workload is not at issue in this proceeding.

7

comments, various types of anti-Union literature began appearing throughout Respondent's facility, including in glass enclosed bulletin boards that are maintained by Human Resources. Exh. C ¶33. Significantly, Respondent posted at least one flyer bearing its logo, which encouraged employees not to sign anything supporting the Union. Exh. G. Isaza posted competing literature from a pro-Union and/or a pro-workers' rights perspective. Exh. C ¶33.  During this same period, on about six occasions during the ensuing two months, Respondent hosted mandatory  meetings at which managers expressed Respondent's opposition to unions and invited employees to ask questions and provide feedback. Exh. C ¶18.

While mounting a public anti-union campaign, Respondent immediately took drastic action behind the scenes to step up its campaign in an unlawful way, by expediting urgent measures to quell employees' complaints about wages. On June 16, just two days after Respondent's first anti-union town hall meeting on or about June 14, the Vice President of Human Resources for Respondent's BioPharma Division, Kia Christian[11], emailed a Compensation Specialist alerting him to the "critical situation in our Bohemia NY site" and asking for information about whether "our highly skilled/specialized roles are paid competitively or not." Exh H. She explained that "[m]ost of the employees are not in favor of a 3rd party speaking on behalf of our employees however the one issue that people are displeased with is comp/wages in particular." *Id.* She asked to obtain this information about employee pay "as quickly as possible" because the "situation is escalating" as "[e]ach day we have been presented with new flyers and now an external website has been created – almost entirely pointing to pay gaps." *Id.*

---

[11] Christian regularly works out of Pennsylvania, not in Respondent's Bohemia facility.

On July 28, Respondent issued a written warning to Isaza for committing documentation errors, including what Respondent refers to as "batch record errors." Exh. I. Later in the day, Isaza distributed a letter to Respondent's 22 press operators stating that there was enough support among those employees to call an election and setting forth a proposed union wage scale. Exh. J. The letter, entitled "RE: Union Pay Scale," identified the employees to be included in the bargaining unit and gave a name to the labor organization: Printing Pressmen of Clintrak. *Id.*

Within a couple of days after Isaza distributed his July 28 letter to the press operators, Respondent announced that it would be instituting new wage increases. Exh. C ¶27. General Manager Scarth met with employees, and while holding Isaza's July 28 letter in his hand, promised that Respondent was looking into raises to address wage disparities but that Isaza's proposed wage scale was "unfounded," adding "remember that the union would have to bargain for everything, you could lose what you have now or get worse." *Id.*

By August 4, Isaza received verbal confirmation that 13 press operators out of a potential bargaining unit of 22 would vote for the Union in a secret ballot election. Exh. C. ¶29. However, eight of the 13 supporters would not sign an authorization card because they saw how virulently Respondent was opposed to the Union, and how Respondent had retaliated against Isaza by locking him out of the building, increasing his workload, and issuing him a written warning. *Id.* Despite the writing on the wall, Isaza was able to collect signed authorization cards from the five remaining supporters who Respondent had failed to deter. *Id.*

Throughout the month of August, Respondent met with the press operators to give them their usual mid-year evaluations. Exh. C ¶30. Although no press operator had ever received or heard of an employee receiving a wage increase at any time other than at year-end, Respondent – for the first time – gave employees wage increases with these mid-year evaluations. Exh. K ¶6; Exh. L ¶6.

In some cases, Respondent made clear to employees what had prompted this departure from the usual practice. For instance, during a mid-August meeting with employee Van Petterson, Human Resources Director Lombardo asked him "how do you feel about the situation with the talk about the union"? Exh. K ¶5. When Van Petterson pointed out discrepancies between his pay and that of a more junior employee, the HR Director responded that "we're aware that you're on the lower pay scale and we're looking into it." *Id.* At Van Petterson's subsequent mid-year performance meeting, Respondent gave him a 3% wage increase. *Id.* Employee Mazza was given a 5% wage increase at his mid-year evaluation. Exh. L ¶6.

## D. RESPONDENT ESCALATED ITS PRETEXTUAL DISCIPLINE OF ISAZA AND THEN UNLAWFULLY TERMINATED HIM

On August 7, Respondent issued to Isaza a final written warning based on a meeting with Supervisor Rasul and a co-worker in which Isaza allegedly slammed his fist on a desk. Exh. M. Although there were three people in the room during the alleged misconduct – Isaza, co-worker Timothy Kitson, and Supervisor Abid Rasul – Isaza's sworn testimony is the only evidence pertaining to what happened because neither Kitson nor Rasul provided affidavits. In Isaza's affidavit, he denies slamming his fist on the desk. Exh. C ¶31. Rather, Isaza testified that Rasul accused Isaza of delaying the start of

his shift and pointed out instances in which the "productivity tracker," which is triggered when jobs are initiated or completed, showed a delay (ranging from 30 to 90 minutes) at the beginning of Isaza's and Kitson's shift. *Id.* In response, Isaza explained that he "only delayed in creating an electronic record of beginning the job, but did not delay in actually beginning the job, because sometimes issues (e.g. problems with the glue unit, damaged dye, dye missing, discrepancies in the paperwork, etc.) can come up that prevent the job from running successfully." *Id.* Isaza's explanation makes sense in light of the undisputed fact that a job must be set up before being initiated, which is a time consuming and highly detail-oriented process. A hasty set up, i.e. one that overlooks problems with the glue, dyes, paperwork, etc., can cause a job to have to be re-run at additional expense. When Rasul summarily dismissed Isaza's explanation and persisted in questioning Isaza about the purported delay, Isaza, frustrated with Rasul's intransigence, "placed an open hand on the table for emphasis as [he] said, 'so you want me to send the job over as soon as I come in?'" *Id.* Rasul did not directly respond to Isaza's question, and the meeting ended with the men staring blankly at each other. *Id.*

On August 16, Respondent issued to Isaza a negative midyear performance appraisal – by far the most negative appraisal that he had received by Respondent. Exh. N. The appraisal assigned negative ratings to Isaza on three bases: failure to meet daily pacing/production goals (which had been increased for Isaza since he began the Union campaign); failure to meet batch record accuracy goals (for which Isaza had been disciplined since he began the Union campaign); and failing to update the troubleshooting log (despite the fact that Respondent had not yet created the troubleshooting log, and therefore, Isaza could not have updated it). *Id.*

On August 23, Respondent issued to Isaza a second final written warning, this time based on his alleged failure to follow procedure in printing labels. Exh. O. The discipline rests on a violation of SOP/WI (Standard of Procedure/Work Instruction) 1500.1 and 1500.2. *Id.* Although requested during the course of the investigation, Respondent did not provide these policies to Petitioner.

According to a document provided by Respondent and entitled "request to terminate employment for performance or cause," on August 31, Isaza allegedly was away from his work station for one hour and six minutes. Exh. P. Isaza denies having been away from his work station. Other than an unsubstantiated assertion in an internal Respondent email, which states that one manager noticed that Isaza was not at his work station 25 minute into his shift on August 31, Respondent does not claim that any of its managers or supervisors looked for Isazaor paged him on the day that he was allegedly missing. In fact, there is no evidence to show that Respondent ever confronted Isaza with the allegation that he was away from his work station for any extended period of time on any day. Respondent does not even claim that it asked Isaza for his side of the story.

On September 14, two weeks after the alleged incident, Respondent terminated Isaza for what transpired on August 31. Exh. C ¶33. At the termination meeting, Supervisor Rasul mentioned that Isaza had failed to trigger his productivity tracker at the beginning of a shift during the week prior, but did not mention that Isaza had been allegedly missing from his work station. *Id.*

**E.    IN THE WAKE OF RESPONDENT'S COERCIVE WAGE INCREASES, RESPONDENT'S DISCRIMINATORY DISCHARGE OF ISAZA ENDED THE UNION CAMPAIGN**

Respondent's discharge of Isaza abruptly defeated the Union campaign. The employees simply stopped talking about the union. Pressman Van Petterson testified that "since the Employer terminated [Isaza], I have not heard any employees discussing the idea of unionizing, or taking any steps towards forming a union." Exh. K ¶8. Similarly, Pressman Mazza testified that since Respondent terminated Isaza, "none of my coworkers bring up the subject of the union (other than myself)." Exh. L ¶9.

Furthermore, following Isaza's termination, employees contacted by the Board have refused to cooperate with the Board investigation because of fear of retaliation by Respondent.

## V.    ARGUMENT

**A PRELIMINARY INJUNCTION SHOULD ISSUE TO RESTRAIN RESPONDENT AS THERE IS REASONABLE CAUSE TO BELIEVE THAT UNFAIR LABOR PRACTICES HAVE OCCURRED**

**A.    The Statutory Scheme Under Which Injunctive Relief is Sought**

Section 10(j) of the Act,[12] authorizes United States District Courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its

---

[12] Section 10(j) (29 U.S.C. Section 160(j)) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

unlawful objective before being placed under any legal restraint, and it could thereby render a final Board order ineffectual.[13] Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation.[14] To resolve a 10(j) petition, a District Court in the Second Circuit considers only two issues: first, whether there is "reasonable cause to believe" that a respondent has violated the Act and, second, whether temporary injunctive relief is "just and proper."[15]

## B.    The "Reasonable Cause" Standard

The "Regional Director's determinations regarding 'reasonable cause' receive significant deference" by the District Court.[16] In determining whether there is reasonable cause to believe that the Act has been violated, the District Court may not decide the merits of the case.[17] Rather, the Court's role is limited to determining whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals."[18] The District Court should not resolve contested

---

[13] *See Kreisberg v. HealthBridge Management, LLC*, 732 F.3d 131, 143 (2d Cir. 2013), *cert. denied* 135 S.Ct. 869 (2014); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975) (citing S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947)), reprinted at I *Legislative History of the Labor Management Relations Act of 1947* 414, 433 (Government Printing Office 1985).

[14] *See, e.g., Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38.

[15] *See, e.g., Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d 462, 468-469 (2d Cir. 2014); *Kreisberg v. HealthBridge Management, LLC*, 732 F.3d at 141-142; *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 365 (2d Cir. 2001); *Silverman v. J.R.L. Food Corp. d/b/a Key Food*, 196 F.3d 334, 335 (2d Cir. 1999). *See also Mattina v. Kingsbridge Heights Rehabilitation and Care Center*, 329 Fed.Appx. 319, 321 (2d. Cir. 2009).

[16] *Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d at 469.

[17] *See Kaynard v. Mego Corp.*, 633 F.2d 1026, 1032-1033 (2d Cir. 1980).

[18] *Id.* at 1033 (quoting *McLeod v. Business Machine and Office Appliance Mechanics Conference Board*,

factual issues; instead, the Regional Director's version of the facts "should be given the benefit of the doubt"[19] and, together with the inferences therefrom, "should be sustained if within the range of rationality."[20] The District Court also should not attempt to resolve issues of credibility of witnesses.[21]

Similarly, on questions of law, the District Court "should be hospitable to the views of the [Regional Director], however novel."[22] The Regional Director's legal position should be sustained "unless the [district] court is convinced that it is wrong."[23]

## C.    The "Reasonable Cause" Standard Has Been Met

The investigation of the allegations in the administrative complaint has established substantial evidence to support the conclusion that Respondent violated Sections 8(a)(1) and (3) of the Act in its efforts to nip in the bud its employees' Union campaign, led by Isaza. In that regard, the evidence establishes that Respondent unlawfully granted wage increases to its employees in order to discourage them from supporting the Union, and that Respondent discriminated against Isaza, by way of an

---

300 F.2d 237, 242 n. 17 (2d Cir. 1962)).

[19] *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37.

[20] *Kaynard v. Mego Corp.*, 633 F.2d at 1031.

[21] *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1051-1052, n. 5. *See also NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570, 1571 (7th Cir. 1996); *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150-51 n. 2 (D. Mass. 1983), *aff'd per curiam* 725 F.2d 664 (1st Cir. 1983).

[22] *Kaynard v. Mego Corp.*, 633 F.2d at 1031 (quoting *Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, I.L.G.W.U.)*, 494 F.2d 1230, 1245 (2d Cir. 1974)).

[23] *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1051. Accord: *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995)("appropriate deference must be shown to the judgment of the NLRB, and a District Court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed"); *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d at 365.

increased workload, multiple disciplines, a negative performance appraisal, and ultimately termination.

> (i)    There is Reasonable Cause to Believe that Respondent Unlawfully Granted Wage Increases to Discourage its Employees From Supporting the Union, in Violation of Sections 8(a)(1) and (3) of the Act

In *NLRB v. Exchange Parts*, the Supreme Court held that "the conferral of employee benefits while a representation election is pending, for the purpose of inducing employees to vote against the union," interferes with the employees' protected right to organize.[24] "Similarly, an employer cannot time the announcement of the benefit in order to discourage union support, and the Board may separately scrutinize the timing of the benefit announcement to determine its lawfulness."[25] Notably, the rule set out in *Exchange Parts* is also applicable to promises or conferral of benefits during an organizational campaign but before a representation petition has been filed.[26] "The motive for the conferral of the benefit during the organizational campaign must be to interfere with—i.e., an effort to influence—the union organizing."[27] Under settled Board precedent, "[a]bsent a showing of a legitimate business reason for the timing of a grant of benefits during an organizing campaign, the Board will infer improper motive and interference with employee rights under the Act."[28]

---

[24] 375 U.S. 405 (1964).

[25] *Mercy Hospital Mercy Southwest Hospital*, 338 NLRB 545 (2002).

[26] *Hampton Inn NY—JFK Airport*, 348 NLRB 16, 17 (2006).

[27] *Manor Care of Easton, Pa*, 356 NLRB 202, 222 (2010).

[28] *Id.*

Here, the incontrovertible documentary evidence establishes that Respondent decided to implement unprecedented midyear wage increases for the express purpose of discouraging employees support for and destroying the Union campaign. In internal communications preparing the wage increases, agents of Respondent explicitly described Isaza's unionization effort as a "critical situation" and explained that the urgency of the situation, in Respondent's eyes, stemmed from the "flyers" that Isaza had created, as well as his "external website […] almost entirely pointing to pay gaps." The internal communications also described the immediate need for information about Respondent's wage structure – which was one of the main issues driving the union organizing – because the "situation" was "escalating. This evidence shows that the wage increases were implemented at the time of midyear evaluations in August, rather than with year-end evaluations (typically in March) as had been Respondent's established practice, in order to defeat the Union campaign.[29]

Although not necessary to finding a violation of the Act, the evidence also shows that Respondent expressed its strong anti-Union sentiments directly to employees. General Manager Scarth met with employees a day or two after Isaza distributed a proposed union wage scale to the Pressmen.  During that meeting, Scarth prominently and visibly held Isaza's letter and said "we are looking into adjustments for wages for certain employees to address the disparities" but that "the proposed wage scale is unfounded" and warning employees with a union, they risked ending up getting less money. Additionally, in at least one meeting, Human Resources Director Lombardo specifically interrogated an employee about whether or not he supported the Union and

---

[29] Significantly, no Pressman can recall the Employer ever giving out a mid-year raise in the history of the company before Isaza's organizing campaign. *See* Exh. K ¶6, L ¶6.

promised to "look into" giving the employee a raise when he complained about pay.[30] The employee learned that Respondent had granted him a 3% wage increase shortly thereafter.

Respondent attempts to argue that it had begun planning the midyear wage increases long before it learned of the Union campaign as a part of a worldwide review of compensation that began in mid-2015. However, the only evidence that Respondent provided were documents discussing a worldwide compensation review in general terms. None of the documents prior to June 7, 2017, the date that Isaza made his Union campaign public, mention any specific pay raises at the Bohemia facility, or any midyear pay raises at all. This set of document amounts only to evidence that Respondent was in a multiple years-long effort to build resources on a corporate level that local HR employees could utilize in potentially making changes to compensation. Significantly, the only references to midyear pay raises at the Bohemia facility post-date June 7, 2017, after Respondent knew about the Union campaign.

Respondent's defense is the same as the failed defense argued in *Manor Care of Easton, PA*:

> The difficulty with the Respondent's argument [...] is that while it admits that the increases were first approved [...] well after the commencement (and after the Respondent's knowledge) of the organizing campaign, it offers nothing to show that the wage increases were likely, much less planned, or a foregone conclusion, or essentially decided on prior to the commencement of any union activity. At most, the Respondent has proven that prior to the union campaign it was looking into the possibility that it would give a wage increase.[31]

---

[30]Exh. K ¶5.

[31] 356 NLRB at 222 (2010).

Thus, evidence like that proffered by Respondent, showing that an employer is merely "looking into the possibility that it would give a wage increase," is insufficient to disprove the Board's compelling inference that Respondent had an improper motive in implementing the increase. Even if Respondent could prove that it had decided to implement wage increases to Pressman at the Bohemia facility prior to learning about the Union campaign, which it cannot, Respondent's evidence also fails to explain the unprecedented timing of the midyear increases.[32] Rather, the evidence shows that the wage increases were expedited as a direct and timely response to undermine the Union campaign and persuade employees to abandon their organizing efforts.

Because the evidence clearly establishes that Respondent implemented midyear wage increases during the Union campaign in order to discourage employees from supporting the Union, there is reasonable cause to believe that Respondent violated Sections 8(a)(1) and (3) of the Act as alleged.

      (ii)    There is Reasonable Cause to Believe that Respondent Discriminated Against Isaza, in Violation of Sections 8(a)(1) and (3) of the Act

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). In analyzing alleged violations of Section 8(a)(3), the NLRB employs a burden-shifting framework. "First, the General Counsel of the NLRB must demonstrate that 1) the employee was engaged in protected activity, 2) the employer was aware of this

---

[32] *See Mercy Hospital Mercy Southwest Hospital*, 338 NLRB at 545 ("the Board may separately scrutinize the timing of the benefit announcement to determine its lawfulness").

activity, and 3) the employee's protected union activity was a substantial or motivating factor behind the employer's decision to take the adverse employment action."[33] With regard to the third prong, the Board and the Courts have held that other unfair labor practices are probative evidence of antiunion animus that can be used by the General Counsel in meeting his burden of showing that an adverse action against an employee constitutes unlawful discrimination.[34]

Once the General Counsel has satisfied his burden, the burden then shifts to Respondent, who may show, as an affirmative defense, that it would have taken the adverse actions "in any event and for valid reasons."[35] However, "if the evidence establishes that the reasons given for the respondent's action are pretextual—that is, either false or not in fact relied upon—the [r]espondent fails by definition to show that it would have taken the same action for those reasons, absent the protected conduct, and thus there is no need to perform the second part of the analysis."[36] "Unlawful motive may be demonstrated not only by direct evidence but by circumstantial evidence, such as timing, disparate or inconsistent treatment, expressed hostility toward the protected activity, departure from past practice, and shifting or pretextual reasons being offered for the action."[37]

---

[33] *NLRB v. Matros Automated Electrical Construction Corp.,* 366 Fed.Appx. 184, 187 (2d Cir.2010) (citing *Golden State Foods Corp.,* 340 NLRB 382, 385 (2003)).

[34] See, *St. Margaret Mercy Healthcare Centers,* 350 NLRB 203, 203-04 (2007), enf. 519 F.3d 373 (7th Cir. 2008) (trial judge properly found unlawful animus where he determined that employer had made threats and engaged in overbroad application of work rules).

[35] *NLRB v. Transportation Mgmt Corp.,* 462 U.S. 393 at 400 (1983), 103 S.Ct. 2469.

[36] *Golden State Foods,* 340 NLRB 382 at 385.

[37] *Real Foods Co.,* 350 NLRB 309, 312 n. 17(2007) (internal citation omitted); *NLRB. v. G&T Terminal Packaging Co., Inc.,* 246 F.3d 103, 116 (2d Cir. 2001) (The Board may consider direct or circumstantial

Here, there is no dispute that Isaza engaged in protected activity of which Respondent was well aware. Therefore, for each adverse action that Respondent took against Isaza, the only element of the General Counsel's case that must be analyzed is whether Isaza's protected union activity was a substantial or motivating factor of Respondent. For all instances, beginning with Isaza's increased workload on June 8, and ending with Isaza's September 14 termination, substantial evidence shows that Respondent took action against Isaza because he initiated the campaign to organize the Union and to discourage employees from supporting the Union.

In fact, the evidence of Respondent's anti-union animus is overwhelming. The affidavit evidence clearly establishes that Respondent engaged in a public anti-Union campaign by way of mandatory meetings in which managers repeatedly expressed to employees the company's opposition to labor organizations. This alone is sufficient to establish Respondent's anti-Union animus, but there is more. Behind closed doors, the indisputable documentary evidence establishes that Respondent's anti-Union animus motivated its efforts to mollify its employees and get them to abandon their organizing efforts by increasing their wages (as shown above). Notably, Respondent's anti-Union animus became evident nearly the moment that it learned of Isaza's June 7 email entitled "Unionizing." To wit, after Isaza's immediate supervisor forwarded Isaza's June 7 email to Associate Director Greenwood, only 63 minutes passed (from 7:17 AM to 8:20 AM) before Greenwood pulled the trigger on a  plan to isolate Isaza and neutralize his message. In sum, the evidence is clear that there is reasonable cause to believe that Isaza's protected union activity motivated Respondent's actions against Isaza.

---

evidence that an employee's protected activities motivated the employer's action of discharging him.).

In light of the inescapable conclusion that the evidence is sufficient to meet the General Counsel's burden, the next step of the Board's analysis is to consider whether Respondent can show, as an affirmative defense, that its adverse actions against Isaza would have occurred even absent his protected activities. While Respondent will have another opportunity to attempt to meet its burden during the administrative hearing, the evidence adduced during the investigation clearly shows that Respondent will fail to do so. With regard to each of Respondent's adverse actions against Isaza, the defenses proferred are either entirely unsupported by evidence or plainly pretextual.

*(a) Respondent fails to prove that it would have increased Isaza's workload in the absence of his protected union activities.*

The affidavit evidence establishes that after June 7, the date that Isaza distributed his first email about the Union, Respondent began assigning a greater workload to him by sending more jobs to him for each shift, which had not been changed. Respondent does not dispute its motivation; rather, Respondent disputes that it increased Isaza's workload at all. Exh. U. However, Respondent utterly fails to provide the evidence that would substantiate this claim.

The work that Isaza must complete during his shift is delivered to him in a daily email that contains a list of jobs, called the "pacing email." Exh. C ¶10. There is no dispute that Respondent assigns a time estimate to each job according to a formula, and the time estimates are listed in a document called a "production schedule." Naturally, an examination of both sets of documents would establish Isaza's daily workload, and any trends therein. While Respondent admits that it is in possession of both the pacing emails and the production schedule, and the Board has requested those documents in order to

22

analyze the allegation (Exh Q, request no. 7(e); Exh. V request no. 3), inexplicably, Respondent failed and refused to provide Isaza's pacing schedules for the relevant period (between May 3, 2017 and August 22, 2017).

Respondent cannot meet its burden of establishing an affirmative defense, nor can it attempt to poke holes in the General Counsel's case, by making contentions that are wholly unsubstantiated by evidence. This is particularly true where the pertinent documents are readily available to Respondent, but withheld for unexplained reasons. Based on the overwhelming evidence of Respondent's anti-Union animus, disparate treatment, and the timing of Isaza's increased workload, the Board has met its burden of proving that this adverse action violated the Act. Because Respondent has utterly failed to prove any sort of defense, there is reasonable cause to believe that Respondent increased Isaza's workload because he initiated the Union campaign, and to discourage employees from supporting the Union.

### (b) Respondent fails to prove that it would have issued Isaza's July 28 written warning in the absence of his protected union activities

Respondent attempts to argue, without evidence, that it would have issued a written warning to Isaza on July 28, even absent his protected activities, because Isaza's work included "batch record errors," meaning erroneous or incomplete paperwork. At the same time, Respondent admits that it cannot prove this claim because it historically has not held employees responsible for batch record errors. In its November 21 position statement, Respondent admitted that the prior supervisor of Isaza's department, Joe MacDougall, "fail[ed] to hold employees accountable," and the current Supervisor, Abid Rasul, "did not discipline any employees for batch record errors in 2016." Exh. W. As for

23

2017, Respondent admitted that of the four employees who operate the Onsert Press, three had comparable batch record errors. Despite the fact that "Tim Kitson and James Timlin each had seven batch errors through September while Herman Isaza had eight errors in that time period," Respondent only disciplined Isaza, giving him a written warning. *Id.* While Isaza admits that he did make certain batch record errors, Respondent cannot point to a single case in which an employee in Isaza's shoes received a written warning for the same reason.

Based on the overwhelming evidence of Respondent's anti-Union animus, disparate treatment, and the timing of the discipline, the Board has met its burden of proving that this adverse action violated the Act. Because Respondent has failed to provide any probative evidence that would meet its burden of establishing an affirmative defense, there is reasonable cause to believe that Respondent issued Isaza a written warning on July 28 because he initiated the Union campaign, and to discourage employees from supporting the Union.

> *(c) Respondent fails to prove that it would have issued Isaza's August 7 final written warning in the absence of his protected union activities.*

Respondent attempts to argue, again without evidence, that it issued a final written warning to Isaza on August 7 because Isaza "slammed his fist on a desk during a meeting with his manager and a co-worker." Exh. U. However, Isaza denies doing so in a sworn affidavit. Exh. C ¶31. Despite the availability of two witnesses to this alleged misconduct, and although requested during the course of the investigation, Respondent refused to provide any evidence, such as sworn affidavit testimony, to prove that Isaza acted inappropriately. Exh. Q. While Isaza's "co-worker" is likely not an agent of

24

Respondent, and therefore could not be compelled by Respondent to cooperate in the investigation, Respondent refused to provide the contact information of its employees that would have allowed the Board to include the co-worker's testimony in the investigation. Exh. Q, request no. 2. Furthermore, Respondent affirmatively refused to provide the manager at issue, Rasul, for purposes of giving an affidavit. Thus, Respondent relies solely on unsubstantiated contentions, and has not provided any evidence at all, to support its defense.

It is well settled that the District Court should not make credibility determinations during a 10(j) proceeding.[38] Here, Respondent has rendered this point moot by failing to provide any evidence to dispute Isaza's sworn testimony.

Based on the overwhelming evidence of Respondent's anti-Union animus, disparate treatment, and the timing of the discipline, the Board has met its burden of proving that this adverse action violated the Act. Because Respondent has failed to provide any probative evidence that would meet its burden of establishing an affirmative defense, there is reasonable cause to believe that Respondent issued Isaza a final written warning on August 7 because he initiated the Union campaign, and to discourage employees from supporting the Union.

> *(d) Respondent fails to prove that it would have issued Isaza's August 16 unfavorable performance appraisal in the absence of his protected union activities.*

Respondent attempts to argue that Isaza's protected activities played no role in his August 16 performance review, and relies on the purported fact that it is "a balanced

---

[38] *Palby Lingerie, Inc.*, 625 F.2d at 1051-1052, n. 5.

review" that comments on both positives and negatives. Exh. W at 2. However, the evidence plainly shows that Respondent used the document to target Isaza by assigning him unfavorable ratings with regard to three goals: daily pacing/production goals, batch record accuracy, and the troubleshooting log.

The first two goals, daily pacing/production goals and batch record accuracy, go to show that the performance appraisal played a key role in Respondent setting Isaza up to fail. As explained above, Respondent had previously retaliated against Isaza by increasing his workload (i.e. setting unrealistic pacing goals) and by holding his batch records to a higher standard than other employees'. Respondent compounded its unlawful retaliation against Isaza by documenting its heightened scrutiny of his work in this performance appraisal, which is more critical than Isaza had ever previously received.

The third goal, "update troubleshooting log for all issues in share drive," highlights the extent to which Respondent was willing to go in nitpicking Isaza's work. Despite assigning Isaza a "yellow" score on Respondent's green/yellow/red scale, the appraisal itself admits that "Employee couldn't start this goal because manager did not complete a file and setup example as of yet." Thus, all three negative ratings in Isaza's August 16 appraisal are criticisms of Isaza's performance through no failing of his own.

Although requested, Respondent did not provide any performance appraisals for any other employee, which could be compared to the appraisal issued to Isaza. Exh. Q, request no. 6. The record evidence, including a glowing performance appraisal and sworn testimony describing that Respondent considered sending Isaza to Europe as a model employee, shows that Respondent held Isaza in very high regard before he initiated the

Union campaign. Thus, Respondent cannot meet its burden to prove that it would have issued the unfavorable appraisal even absent Isaza's protected activities.

Based on the overwhelming evidence of Respondent's anti-Union animus, disparate treatment, and the timing of the unfavorable appraisal, the Board has met its burden of proving that this adverse action violated the Act. Because Respondent has failed to provide any probative evidence that would meet its burden of establishing an affirmative defense, there is reasonable cause to believe that Respondent issued Isaza the August 16 unfavorable performance appraisal because he initiated the Union campaign, and to discourage employees from supporting the Union.

> *(e) Respondent fails to prove that it would have issued Isaza's August 23 final written warning in the absence of his protected union activities.*

Respondent makes no argument in its position statement pertaining to the August 23 final written warning, except that it was justified by Isaza's prior discipline and his failure to "follow procedures." For the reasons described above, Isaza's prior disciplines were part and parcel of a swiftly enacted anti-Union campaign to intimidate other employees and lay the groundwork for Isaza's ultimate termination. These pretextual disciplines therefore cannot be relied upon as a legitimate precursor to more serious progressive discipline.

As for Isaza's alleged failure to follow procedures, the discipline document itself notes that Isaza allegedly made a mistake in violation of "SOP/WI [Standards of Procedure/Work Instruction] 1500.1 and 1500.22." Exh. O. During the course of the investigation, the Board requested that Respondent provide "all employee handbooks,

rules, and/or policies that Isaza allegedly violated, and which formed the basis for any unfavorable appraisal, discipline, and/or termination," as well as "documents showing any unfavorable appraisals, disciplines and/or terminations that the Employer imposed on other employees for violating the handbooks, rules and/or policies responsive to [the above-quoted] request. Exh. Q, request nos. 4 and 6. Despite these requests, Respondent did not provide SOP/WI 1500.1 or 1500.22. Nor did Respondent provide any examples of other employees who were disciplined for violating SOP/WI 1500.1 or 1500.22. Without evidence that Respondent treated Isaza in the same way that it treats other employees, Respondent cannot prove that it would have disciplined Isaza absent his protected activities.

The discipline also states that, "this type of error, had it not been detected internally, could have resulted in a potential patient impacting event and/or packaging delays." Exh. O. While this assertion is questionable given the details of the alleged infraction, it is relevant because it demonstrates Respondent's disparate treatment of Isaza. Whereas Respondent issued Isaza a final written warning – one step from termination – for his infraction, Respondent merely issued a warning – lesser discipline – to employee Rob Solano, whose failure to perform one of his duties "for a month" actually caused "a major patient impacting event" in which drug products were labeled incorrectly and delivered to patients. Exh. R. This type of disparate treatment evidence is routinely viewed by the Board as evidence of Respondent's unlawful motive.[39]

Based on the overwhelming evidence of Respondent's anti-Union animus, disparate treatment, and the timing of the discipline, the Board has met its burden of

---

[39] *See Golden State Foods,* 340 NLRB 382 at 385.

proving that this adverse action violated the Act. Because Respondent has failed to provide any probative evidence that would meet its burden of establishing an affirmative defense, there is reasonable cause to believe that Respondent issued Isaza a final written warning on August 23 because he initiated the Union campaign, and to discourage employees from supporting the Union.

> *(f) Respondent fails to prove that it would have terminated Isaza on September 14 in the absence of his protected union activities.*

Finally, Respondent attempts to argue that it would have terminated Isaza on September 14, even absent his protected activities, "after being away from his workstation for the first hour and six minutes of his shift on September 13 without a valid explanation for his absence." Exh. U at 5. Despite this representation by Respondent's counsel, Respondent also provided conflicting documents during the course of the investigation stating that, rather than firing Isaza for going missing for 66 minutes on September 13, Respondent actually terminated Isaza because he went missing for 66 minutes on August 31. In a document dated September 8, and entitled "Request for Termination," Respondent wrote, "most recently, on August 31, [Isaza's] whereabouts at the beginning of his shift were unknown and he failed to complete assigned work for 1 hour and 6 minutes into his shift." Exh. P. As an initial matter, under well settled Board law, this type of "shifting" reason for an adverse employment action demonstrates unlawful motive.[40]

---

[40] *See Real Foods Co.,* 350 NLRB at 312 n. 17.

Isaza denies that he was missing from his work station for any extended period of time on either of the two days in question. Rather, he worked as assigned and offers a reasonable explanation for why the productivity tracking records show that he did not initiate his first job until one hour and six minutes into his shift on one of the two days in question, August 31. Isaza had even offered that explanation to Rasul during an August 3 meeting, and Rasul did not direct Isaza to sacrifice the quality of his work for the sake of initiating a job as early as possible. Exh. C ¶31. Respondent does not dispute that only certain actions trigger the productivity tracker, and that performing other actions (which do not trigger the productivity tracker) at the beginning of a shift has no impact on an employee's efficiency. Respondent points to is no evidence to show that Isaza was actually missing from his work station for an extended period of time. Nor is there any evidence that Respondent ever confronted Isaza with the allegation. These facts totally eviscerate Respondent's defense and expose it as pretext.

Instead of ever asking Isaza if he had been away from his work station on August 31, two weeks later on September 14, Respondent merely informed Isaza that he was being terminated because he had failed to trigger the productivity tracker immediately at the beginning of his shift on one day "the week prior." Exh. C ¶34. Respondent's failure to ask Isaza to explain his whereabouts, otherwise question him about his alleged absence, or afford him the opportunity to present his side of the story is additional evidence that the termination was pretextual.[41]

---

[41] *See Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 582 (2d Cir. 1988) ("When Orrego was dismissed, he was not permitted to explain the incident. This alone raises a serious question whether Feinberg was attempting to find a plausible pretext to discharge him.      Moreover, when Orrego arrived at the garage, the dispatcher did not reprimand him or even mention the matter to him. This also raises an inference that the employer was searching for an excuse to terminate Orrego.      In addition, the company waited two days before discharging him.      .") (citations omitted).

Perhaps most significantly, even if Isaza were absent from his workstation for a period of time, Respondent has not terminated other employees for similar behavior in the past. For instance, the evidence shows that Respondent failed to terminate employee Thomas Farino until he abandoned his job, even though Farino had serious and recidivist infractions pertaining to his failure to remain at his work station as assigned. Exh. S. Farino received only warnings, even when he had "left early or been absent seven times" during January 2016, and was "going outside for smoke breaks 8-10 times a night." *Id.* Then, even when Farino had five unplanned absences in the next four months, and "in excess of twelve additional instances where [he] did not work [his] complete shift," Farino got yet another warning. In addition, Respondent noted that Farino's "door scans from area to area are more than double of all of [his] coworkers. This indicates that [he was] spending significantly more time away from running [his] equipment." *Id.* Even when, "on 4/18/16, [Farino] took an extended lunch break of 1-1/2 hours without prior approval," Respondent did not terminate him. *Id.* Respondent only terminated Farino's employment when he abandoned his job, going absent without any contact from May 6 through May 13, 2016. *Id.*

Similarly, Respondent did not terminate employee Shannon Mallazzo when she went missing from her workstation on "a number of occasions" and explained that she had fallen asleep in her car. Exh. T. Indeed, Isaza's supervisor, Rasul, has never terminated any employee other than Isaza, and none of the comparative examples offered by Respondent involve an employee discharged for being away from his or her workstation. The similarly situated employees that Respondent relies upon to purportedly

show that it would have terminated Isaza in the absence of his protected activities actually demonstrate quite the opposite: that Respondent terminated Isaza for his union activity.[42]

Based on the overwhelming evidence of Respondent's anti-Union animus, disparate treatment, and the timing of Isaza's termination, the Board has met its burden of proving that this adverse action violated the Act. Because the evidence provided by Respondent undermines, rather than supports, its contention that it would have terminated Isaza absent his protected activities, Respondent has failed to meet its burden of establishing an affirmative defense. Therefore, there is reasonable cause to believe that Respondent terminated Isaza because he initiated the Union campaign, and to discourage employees from supporting the Union.

(iii)   Conclusion

In sum, the evidence adduced during the investigation of the charge demonstrates that there is reasonable cause to believe that Respondent engaged in the unfair labor practices for which Petitioner seeks injunctive relief.

**D.   The "Just and Proper" Standard**

The Second Circuit has recognized that Section 10(j) is among those "legislative provisions calling for equitable relief to prevent violations of a statute" and courts should

---

[42] *See, e.g., NLRB v. Future Ambulette, Inc.*, 903 F.2d 140, 143 (2d Cir. 1990) (employer's failure to discipline other employees for similar or more egregious misconduct supports the inference of an unlawful motive rather than good-faith business judgment); *Dash v. NLRB*, 793 F.2d 1062, 1067-69 (9th Cir. 1986) (unlawful motive shown, in part, because employer had condoned a workplace practice -- swearing and abusive or aggressive behavior -- throughout the salesforce until employee engaged in union activity).

32

grant interim relief thereunder "in accordance with traditional equity practice, 'as conditioned by the necessities of public interest which Congress has sought to protect.'"[43] In applying these principles the Second Circuit has concluded that Section 10(j) relief is warranted where serious and pervasive unfair labor practices threaten to render the Board's processes "totally ineffective" by precluding a meaningful final remedy[44]; or where interim relief is the only effective means to preserve or restore the status quo as it existed before the onset of the violations[45]; or where the passage of time might otherwise allow the respondent to accomplish its unlawful objective before being placed under any legal restraint.[46] The "principal purpose of a § 10(j) injunction is to guard against harm to the collective bargaining rights of employees."[47]

### E.   Injunctive Relief is Just and Proper to Prevent Irreparable Harm to the Employees' Statutory Rights and to Protect the Efficacy of the Board's Order

Congress has declared that "encouraging the practice and procedure of collective bargaining" is "the policy of the United States… ."[48] Employees have the right to decide whether they wish "to bargain collectively through representatives of their own

---

[43] *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980) (quoting *Seeler v. The Trading Port, Inc.*, 517 F.2d at 39-40).

[44] *Kaynard v. Mego Corp.*, 633 F.2d at 1034 (discussing *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38).

[45] *Seeler v. The Trading Port, Inc.*, 517 F.2d at 38.

[46] *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1055. Accord: *Kreisberg v. HealthBridge Management, LLC*, 732 F.3d at 143; *Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d at 469; *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d at 368 (Section 10(j) relief "is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo"); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. 246, 255 (S.D.N.Y.), aff'd. 67 F.3d 1054 (2d Cir. 1995).

[47] *Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d at 469.

[48] 29 U.S.C. § 151.

choosing… ."[49] If the lawful status quo is not fully restored in a timely manner, Respondent's actions will inflict irreparable harm to the national labor policy encouraging collective bargaining embodied in § 1 of the Act, the employees' right to organize under § 7 of the Act, and the Board's remedial powers. Without an injunction requiring Isaza's immediate interim reinstatement, Respondent will forever profit from its illegal conduct.

It has long been held that unlawful employee discharges that threaten to "nip" union organizing drives "in the bud" warrant interim injunctive relief on the ground that the reinstatement of such employees is necessary to avoid "serious adverse impact on employee interest in unionization."[50] Indeed, employees "are certain to be discouraged from supporting a union if they reasonably believe it will cost them their jobs."[51] A "likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during .. an organizing drive largely establishes likely irreparable harm… ."[52] In the instant case, as set forth above, the record evidence strongly supports a finding that Respondent violated Section 8(a)(3) of the Act when it discharged Isaza.

The organizational effort is in jeopardy unless Isaza is immediately reinstated. The continued exclusion of Isaza from the workplace sends an inescapable message to

---

[49] 29 U.S.C. § 157.

[50] *Kaynard v. Palby Lingerie, supra,* 625 F.2d at 1052, 1053 (reinstatement of two "active and open union supporters" was just and proper because their discharges "risked a serious adverse impact on employee interest in unionization").

[51] *Abbey's Transp. Servs., Inc. v. NLRB,* 837 F.2d at 576. *See also NLRB v. Jamaica Towing, Inc.,* 632 F.2d 208, 212-13 (2d Cir. 1980) (in the context of a case requesting a *Gissel* bargaining order, the Second Circuit noted that hallmark violations, including discharge of union adherents, are "likely to have a lasting inhibitive effect on a substantial percentage of the work force," and "may reasonably be calculated to have a coercive effect on employees and remain in their memories for a long period.").

[52] *Frankl v. HTH Corp.,* 650 F.3d 1334, 1363 (9th Cir. 2011).

Respondent's remaining employees: engaging in organizing activity will cost them their jobs and the Board cannot provide a timely remedy.[53] The remaining employees, especially those who were undecided about organizing, will not participate in the campaign or support the Union after seeing what happened to Isaza.[54]

Indeed, Isaza's illegal discharge has already had a chilling effect on the organizing campaign, and for good reason. Isaza alone came up with the idea to start an organizing campaign and on his own began meeting with his co-workers over a period of months. He alone began a pro-organizing website aimed at Respondent's employees and seeking higher wages, and it was under his name and email address that the campaign communicated with the employees. Respondent would have fully expected that discharging Isaza would abruptly end the union campaign, and it did. On August 4, Isaza had reassurances that a majority of the Pressmen, 13 out of 22, would vote for the union. Yet, as multiple Pressmen testified, after Respondent fired Isaza, the employees essentially stopped talking about the Union. Moreover, some employees are so frightened of Respondent's retaliation that they have refused to give affidavits. One Pressman explained that he could not sign a Board affidavit because "I don't want to jeopardize my livelihood. I have a lot to lose by my signature." While the chances of forming a Union were strong when Isaza was employed, they are now dismal given the climate of fear Respondent created among employees by discharging Isaza. This is especially true where

---

[53] *See Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001) (ordering interim reinstatement of five employees and noting that "the fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)").

[54] *See Pye*, 238 F.3d at 74-75, 76 ("discharge of active and open union supporters    risks a serious adverse impact on employee interest in unionization"); *Schaub v. West Michigan Plumbing and Heating*, 250 F.3d 962, 971 (6th Cir. 2001) (interim reinstatement under § 10(j) held just and proper); *Sharp v. Webco Industries, Inc.*, 225 F.3d 1130, 1135 (10th Cir. 2000) (interim reinstatement of six union supporters held just and proper).

there is no outside union helping to organize the employees or continue the campaign in Isaza's absence. Any employee who wants a union would have to take on the burden and risk of restarting the organizing drive by his or her self.

The harm to the organizational effort will not be remedied when the Board issues its final order requiring Respondent to reinstate Isaza. That order will come years after Isaza's discharge – too late to erase the chilling effect and revive the campaign.[55] By that time, the remaining employees will have observed that a worker who "attempted to exercise rights protected by the Act had been discharged" and waited for "years to have their rights vindicated."[56] In those circumstances, no worker "in his right mind" will "participate in a union campaign… ."[57] In fact, by that point, Isaza will likely have moved on to another job and will not be available to accept a Board order of reinstatement.[58] The fact that this original Union supporter "will likely never return to work if interim relief is not granted may itself cause irreparable injury to the unionization effort… ."[59] The Board's order will be an "empty formality."[60] Without interim relief,

---

[55] See Pye, 238 F.3d at 75 ("a long time may pass before the Board decides the merits of this case      the disappearance of the 'spark to unionize' may be an irreparable injury for the purposes of § 10(j)"); Aguayo v. Tomco Carburetor Co., 853 F.2d 744, 749-751 (9th Cir. 1988) (interim reinstatement of 11 fired members of organizing committee just and proper under § 10(j)); NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1573 (7th Cir. 1996).

[56] Silverman v. Whittal & Shon, Inc., 125 LRRM 2150, 2151, 1986 WL 15735, *1 (S.D.N.Y. 1986) (interim reinstatement of six union activists held just and proper).

[57] Id.

[58] See generally Weiler, Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA, 96 Harv. L. Rev. 1769, 1792-93 (1983) (studies show significant decline in proportion of discriminatees accepting reinstatement when offered more than six months after discriminatory act), cited with approval in Kobell v. Suburban Lines, Inc., 731 F.2d 1076, 1094 & n.32 (3d Cir. 1984).

[59] Pye, 238 F.3d at 75.

[60] Angle v. Sacks, 382 F.2d 655, 660 (10th Cir. 1967) (ordering interim reinstatement of fired employee organizers under § 10(j)).

Respondent, by violating the Act, will have permanently prevented the employees from exercising their Section 7 right to freely decide whether to be represented.[61]

An offer of immediate interim reinstatement to Isaza provides the best chance of avoiding this unjust result. Interim reinstatement will remove the chilling effect of the discharge on the organizing campaign.[62] The remaining employees will receive an affirmative signal that the Board will timely protect them if they face retaliation for participating in the campaign or supporting the Union.[63] Thus, interim reinstatement will vindicate the employees' right under Section 7 to make a free choice, preserve the Board's remedial authority, and serve the public interest by ensuring that Respondent's unfair labor practices do not permanently succeed.[64] In fact, Isaza has stated that he would accept an offer of interim reinstatement and continue organizing, and several employees indicated that they would be interested in restarting the campaign with the reassurance offered by Isaza's return to work.

Finally, requiring Respondent to read the District Court's order to the employees is just and proper.[65] As the Ninth Circuit recently noted, a reading order is an "effective

---

[61] *See Pye*, 238 F.3d at 75 ("Section 10(j) interim relief is designed to prevent employers from using unfair labor practices in the short run to permanently destroy employee interest in collective bargaining").

[62] *Angle*, 382 F.2d at 660-661 (when the Board finally acts, "the employees then at the plant may not wish to exercise the rights thus secured to them.   [interim] [r]einstatement of the illegally discharged employees is the best visible means of rectifying this").

[63] *See Pye*, 238 F.3d at 74-75 (ordering interim reinstatement of five employees); *Aguayo*, 853 F.2d at 749-750 (interim reinstatement "would revive the union's organizational campaign"); *NLRB v. Ona Corp.*, 605 F. Supp. 874, 886 (N.D. Ala. 1985) (interim reinstatement of a single union activist in a large unit just and proper to revive the campaign and send "an affirmative signal that further union activity will not cause the kind of Company retaliation that has occurred in the past").

[64] Interim reinstatement will pose little harm to Respondent. It is settled that the Section 7 rights of discriminatees to interim reinstatement under § 10(j) outweigh the job rights of their replacements. *See Aguayo*, 853 F.2d at 750. Moreover, Respondent will receive the experienced services of Isaza and will retain its managerial right to impose lawful discipline. *See Pye*, 238 F.3d at 75.

[65] *See Norelli v. HTH Corp.*, 699 F.Supp. 2d 1176, 1206-07 (D.Haw. 2010), *affd.* 650 F.3d 1334 (9th Cir.

but *moderate* way to let in a warming wind of information and, more important, reassurance."[66]

Thus, interim relief is necessary to protect the employees' Section 7 rights, preserve the remedial power of the Board, and effectuate the will of Congress.

## V.  **CONCLUSION**

It is respectfully submitted that the evidence establishes that there is reasonable cause to believe that Respondent violated Sections 8(a)(1) and (3) of the Act as alleged in the Petition and that the injunctive relief sought is just and proper.

Dated at Brooklyn, New York, January 19, 2018.

Respectfully submitted,

Brady Francisco-FitzMaurice
Counsel for Petitioner.
National Labor Relations Board, Region 29
Two MetroTech Center, Suite 5100
Brooklyn, New York 11201

---

2011); *Rubin v. Vista del Sol Health Services, Inc.*, 2015 WL 306292, *2 (C.D. Cal. 2015); *Calatrello v. Gen. Die Casters*, 2011 WL 446685, at *8 (N.D. Ohio 2011); *Overstreet v. One Call Locators Ltd.*, 46 F.Supp. 3d 918, 932 (D. Ariz. 2014); *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F.Supp. 2d 1201, 1218 (E.D. Cal. 2010); *Fernbach v. Sprain Brook Manor Rehab, LLC*, 2015 WL 1029655 *15 (S.D.N.Y. 2015); *see also Concrete Form Walls, Inc.*, 346 NLRB 831, 841 n.3 (2006) (notice-reading remedy "gives teeth to other notice provisions" that charged party must also announce), *enforced mem.*, 225 F. App'x 837 (11th Cir. 2007).

[66] *United Nurses Associations of California v. NLRB*, 871 F.3d 767, 788-89 (9th Cir. 2017)(emphasis in original)(citations omitted). Further, a standard cease and desist order is warranted in this case. Section 10(c) of the Act provides that the Board should require persons violating the Act to cease and desist from that conduct. Courts sitting in equity to enforce the Act in a 10(j) proceeding should fashion remedies guided by those same policies. *Morio v. N. Am. Soccer League,* 632 F.2d 217, 218 (2d Cir. 1980).